IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SCOTT THELANDER,

      Petitioner,

  v.

ANTHONY KANE, Warden, and
ARNOLD SCHWARZENEGGER, Governor,

      Respondents.
                                     /

No. C 05-4689 CW

ORDER GRANTING
PETITION FOR WRIT
OF HABEAS CORPUS

Petitioner Scott Thelander, a state prisoner incarcerated at the Correctional Training Facility in Soledad, California, has filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 alleging that his right to due process was violated when he was denied parole for the eighth time. Respondent Anthony Kane opposes the petition. Having considered all the papers filed by the parties, the Court GRANTS the petition for a writ of habeas corpus.

BACKGROUND

Unless stated otherwise, the following facts are from the record of Petitioner's September 18, 2003 parole consideration

hearing (Pet.'s Ex. A), the May 6, 1981 report of Chief Probation Officer W.A. Herring (Resp.'s Ex. B), or the petition.

In the months preceding the commitment offense, Petitioner was twenty-one years old and had been dating Tamara England, his seventeen-year-old next-door neighbor. Although Petitioner anticipated that they would marry, England ended the relationship towards the end of May, 1979 due to Petitioner's possessiveness and jealousy. England immediately began dating the victim, David Lewis, who had previously been Petitioner's roommate. Petitioner began staying up every night waiting for Lewis and England to return to her home after dates. Once they returned, Lewis would soon leave.

On the evening of June 30, 1979, Lewis and England returned to her home from a date. Upon observing their arrival and hearing England "say something to the effect that she was not ready for sex," Petitioner became very upset and began crying. Around midnight, Petitioner's roommate, Steve Higgins, drove Petitioner to Lewis' home in Petitioner's car so that Petitioner could engage in a fistfight over Lewis' refusal to stop dating England. Because Petitioner and Higgins thought that Lewis might not open his front door, they decided to park Petitioner's car so that Lewis could not see it from his home. Petitioner did not recall bringing the murder weapon, a .44-caliber cap-and-ball type handgun, to Lewis' house nor carrying it to Lewis' front door. The weapon had been loaned to Petitioner by his friend Michael John Foster. Petitioner had previously told Foster that he had been thinking about killing Lewis, but Foster did not think Petitioner was serious.

2

1    Lewis opened his front door, but upon recognizing Petitioner,
2 he attempted to close it.  Petitioner forced himself into Lewis'
3 doorway and began confronting Lewis about his relationship with
4 England.  The record is not clear as to whether punches were
5 thrown.  When Lewis stated that Petitioner "would never know about
6 me and Tammy," Petitioner shot at Lewis, hitting him in the thigh
7 and head.  Petitioner indicated that the crime was not
8 premeditated.  (Pet.'s Ex. B at 64, June 2003 Parole Hearing
9 Report.)  Higgins took the weapon from Petitioner and disposed of
10 it.  Petitioner and Higgins left town for one and a half days.
11    On July 1, 1979, England found Lewis' body lying in his front
12 door.  On July 11, 1979 Petitioner was arrested and charged with
13 first-degree murder.  On May 27, 1981, after a jury trial,
14 Petitioner was acquitted of first-degree murder and convicted of
15 second-degree murder.  The jury further found that Petitioner used
16 a firearm in the commission of the offense and that the complaint's
17 allegation that Petitioner was lying in wait for Lewis was
18 unfounded.  Petitioner was sentenced to fifteen years to life in
19 prison with an additional two years for the gun enhancement.
20    Petitioner has been in continuous custody for twenty-eight
21 years; he will be fifty years old on August 13, 2007.  At the time
22 of his incarceration, Petitioner had completed high school and one
23 year of college.  Petitioner has no history of developmental
24 problems, social problems, or substance abuse, and has no other
25 juvenile or adult arrests, convictions, or incidents of violence.
26 Petitioner's family continues to be supportive of him.  If
27 released, Petitioner plans to reside with his mother in Oroville

3

and has a job offer as a production helper in a wood products company there.

During his incarceration, Petitioner has improved his education and vocational skills and has participated in self-help programs. Petitioner is taking courses in Spanish and college courses in counseling. He also completed forty-five assignments from televised classes supervised by the education department. (Pet.'s Ex. A at 28.) Petitioner received an auto mechanic certification in 1994 and has worked in a variety of jobs while incarcerated, consistently receiving above average or exceptional ratings. Petitioner has completed several self-help courses, one of which he helped establish at the facility.[1] His 1999 psychological report by Dr. Steven Terrini states, "If released to the community, his violence potential is estimated to be no more than the average citizen in the community, and perhaps even lower." (Pet.'s Ex. D at 145.) Dr. Terrini also wrote that Petitioner has expressed remorse which "did appear to be genuine and authentic" and agreed with Dr. W.J. White's 1995 evaluation "that Petitioner has 'a well developed and authentic sense of personal responsibility, guilt and remorse for his murder offense.'" Id. at 144.

Petitioner has been disciplined four times during his twenty-

---

[1] Self-help programs Petitioner has completed include a self-esteem group, Anger Control Therapy, Category T live-in psychological treatment program, Process Group Therapy, Responsibility and Decision-Making, Alternatives to Violence, Breaking Barriers, Conflict Resolution, the Muslim Development Center's Anger Management seminar, an independent self-help course in which Petitioner reads books and writes a report, and IMPACT Victim Awareness which he helped establish at the facility.

4

eight years of incarceration: on August 11, 1984 for possession of a home brew in a cell, on January 6, 1986 for attempting to circumvent procedure on searches, on December 9, 1987 for possession and exchange,[2] and, most seriously, on January 27, 1988 for attempted escape without force when he and another inmate were caught attempting to cut through a prison fence.  Petitioner has been discipline-free for nineteen years.  His classification score is at the lowest possible security rating for a term-to-life inmate.

The Board of Parole Hearings[3] (the Board) denied Petitioner a parole release date seven times on the following dates:  June 22, 1990, April 15, 1992, April 19, 1994, July 5, 1995, July 1, 1997, June 5, 2001, and June 7, 2002.  On September 18, 2003, the Board denied Petitioner a parole release date for the eighth time, concluding that Petitioner "would pose an unreasonable risk of danger to society or a threat to public safety if released from prison."  The Board relied on three factors:  (1) the nature of the commitment offense, stating that it was "carried out in a manner that clearly shows lack of regard for the life and suffering of another" with a "very trivial" motive, (2) that Petitioner had "not sufficiently participated in beneficial self-help programs," and (3) Petitioner's escape attempt in 1988.  Although the Board also

---

[2] The record is not clear regarding what Petitioner possessed and exchanged.  In its September 18, 2003 hearing, the Board stated that Petitioner's December 9 1987 discipline was for "possession and exchange of, maybe, contraband."  (Pet.'s Ex. A at 32.)

[3] The Board of Prison Terms was abolished effective July 1, 2005, and replaced with the Board of Parole hearings.  Cal. Penal Code § 5075(a).

mentioned in its decision that the Butte County District Attorney's Office and Lewis' next of kin opposed a finding of parole suitability, the Board did not cite this as a reason for its denial of parole.  The Board acknowledged that Petitioner was "darned close" to being suitable for parole[4] and paradoxically commended his involvement in self-help programs, his above-average work reports, and his discipline-free record since 1988.

Nevertheless, Petitioner was again denied parole at his April, 25, 2005 and August 15, 2006 hearings.

Petitioner challenged the September 18, 2003 parole denial in a habeas corpus petition filed in the Butte County superior court, which denied it on December 30, 2004 in a pre-printed form with checkmarks.  (Pet.'s Ex. F at 327.)  The checkmarks in the superior court decision indicate only that the petition was denied because "Petitioner has failed to establish a prima facie case for relief on habeas corpus," and that "[b]ecause it has not been adequately established in the moving papers that there has been a change in the applicable law or the facts, the court will not consider repeated applications for habeas corpus presenting claims previously rejected."[5]  Id.  Petitioner again challenged the parole denial by filing a habeas corpus petition in the state court of appeal, which summarily denied it on May 19, 2005.  (Pet.'s Ex. H at 330.)  On August 17, 2005, the State Supreme Court summarily

---

[4] The Board had stated eleven years earlier that Petitioner was "getting close."  (Pet.'s Ex. D at 211.)

[5] It does not appear that Petitioner had filed any previous habeas corpus petitions.

6

denied his petition for review.  (Pet.'s Ex. I at 331.)

On November 15, 2005, Petitioner filed the present habeas corpus petition in which he claims that the Board's September 18, 2003 denial of parole violates his liberty interest in being released on parole, an interest protected by the federal constitutional right to due process.

## DISCUSSION

I.  Legal Standard

A.  The Antiterrorism and Effective Death Penalty Act of 1996

Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), a district court may grant a petition challenging a state conviction or sentence on the basis of a claim that was "adjudicated on the merits" in state court only if the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

Challenges to purely legal questions resolved by the state court are reviewed under § 2254(d)(1); the question on review is (a) whether the state court's decision contradicts a holding of the Supreme Court or reaches a different result on a set of facts materially indistinguishable from those at issue in a decision of the Supreme Court; or (b) whether the state court, after identifying the correct governing Supreme Court holding, then

7

unreasonably applied that principle to the facts of the prisoner's case. Lambert v. Blodgett, 393 F.3d 943, 978 (9th Cir. 2004).

The state court decision to which § 2254(d) applies is the "last reasoned decision" of the state court. Ylst v. Nunnemaker, 501 U.S. 797, 803-04 (1991). Where the state court gives no reasoned explanation of its decision on a petitioner's federal claim and there is no reasoned lower court decision on the claim, a review of the record is the only means of deciding whether the state court's decision was objectively reasonable. Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003). When confronted with such a decision, a federal court should conduct "an independent review of the record" to determine whether the state court's decision was an unreasonable application of clearly established federal law. Id.

B. California Standard for Parole

California Penal Code § 3041 requires that a parole date normally be set for prisoners unless various factors exist. Specifically, one year prior to a prisoner's minimum eligible release date, a panel of the Board shall normally set a parole release date "unless it determines that the gravity of the current convicted offense or offenses, or the timing and gravity of current or past convicted offense or offenses, is such that consideration of the public safety requires a more lengthy period of incarceration for this individual." Cal. Penal Code § 3041(b).

California Code of Regulations, title 15, § 2402 sets forth the criteria for determining whether an inmate is suitable for release on parole. Regardless of the length of time served, a life

8

prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison. Cal. Code Regs. tit. 15, § 2402(a). California Code of Regulations, title 15, § 2402(c)-(d) list the factors that tend to show unsuitability or suitability for parole. The circumstances tending to show unsuitability include: (1) whether the commitment offense was committed in "an especially heinous, atrocious or cruel manner"; (2) the prisoner's previous record of violence; (3) "a history of unstable or tumultuous relationships with others"; (4) commission of "sadistic sexual offenses"; (5) "a lengthy history of severe mental problems related to the offense"; and (6) "serious misconduct in prison or jail." Cal. Code Regs. tit. 15, § 2402(c). Circumstances tending to show suitability include: (1) the prisoner has no juvenile record; (2) the prisoner has experienced reasonably stable relationships with others; (3) the prisoner has shown remorse; (4) the prisoner committed his crime as the result of significant stress in his life, especially if the stress has built over a long period of time; (6) the prisoner lacks any significant history of violent crime; (7) the prisoner's present age reduces the probability of recidivism; (8) the prisoner "has made realistic plans for release or has developed marketable skills that can be put to use upon release"; (9) "[i]nstitutional activities indicate an enhanced ability to function within the law upon release." Cal. Code Regs. tit. 15, § 2402(d).

In <u>In re Dannenberg</u>, 34 Cal. 4th 1061, 1094 (2005), the California Supreme Court interpreted California Penal Code § 3041

and held that the Board may rely solely on the commitment offense to deny parole by heavily weighing the degree of violence used and the amount of viciousness shown by the prisoner. However, the court stated that sole reliance on the commitment offense may violate section 3041(a)'s provision that a parole date "shall normally be set," and thus may also contravene the inmate's constitutionally protected expectation of parole. Id. Such a violation could occur where no circumstances of the offense reasonably could be considered more aggravated or violent than the minimum necessary to sustain a conviction for that offense. Id. at 1094-95. An offense must be "particularly egregious" to justify the denial of parole. Id. at 1095 (citations omitted).

C. Federally Protected Interest in Parole Release

Under California Penal Code § 3041, state prisoners whose sentences allow for the possibility of parole have an interest protected by the Due Process Clause in a parole release date. Irons v. Carey, 479 F.3d 658, 662 (9th Cir. 2007)

The Supreme Court has clearly established that a parole board's decision deprives a prisoner of due process with respect to his constitutionally protected liberty interest in a parole release date if the board's decision is not supported by "some evidence in the record," or is "otherwise arbitrary." Id. When assessing whether a state parole board's suitability determination was supported by "some evidence," the court's analysis is framed by the statutes and regulations governing parole suitability determinations in the relevant State. Id. Accordingly, in California, the court must look to California law to determine the

10

findings that are necessary to deem a prisoner unsuitable for parole, and then must review the record to determine whether the state court decision holding that these findings were supported by "some evidence" constituted an unreasonable application of the "some evidence" principle. Id.

Additionally, the evidence underlying the board's decision must have some indicia of reliability. McQuillion v. Duncan, 306 F.3d 895, 904 (9th Cir. 2002). The court may consider the parole board's decision-making process over time: "The Parole Board's decision is one of 'equity' and requires a careful balancing and assessment of the factors considered. . . A continued reliance in the future on an unchanging factor . . . runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation." Biggs v. Terhune, 334 F.3d 910, 916-17 (9th Cir. 2003). In Biggs, the Ninth Circuit upheld the initial denial of a parole release date based solely on the nature of the crime and the prisoner's conduct before incarceration, but cautioned that "[o]ver time . . . , should Biggs continue to demonstrate exemplary behavior and evidence of rehabilitation, denying him a parole date simply because of the nature of Biggs' offense and prior conduct would raise serious questions involving his liberty interest in parole." Id.

In Sass v. California Board of Prison Terms, 461 F.3d 1123, 1129 (9th Cir. 2006), the Ninth Circuit upheld a denial of parole based on the commitment offense but reiterated that continued reliance on an unchanging factor could result in a due process violation. Like Biggs, Sass had not yet completed serving his

11

minimum term at the time of the parole denial. Sass, 461 F.3d at 1125; Biggs, 332 F.3d at 912-13.

Citing Sass, the Ninth Circuit in Irons, 479 F.3d at 664-65 found that relief for Irons was precluded because his offense was more callous and cruel than Sass's. However, the Ninth Circuit emphasized that in all the cases in which it had held that a parole denial based solely on the commitment offense comported with due process, the denial had occurred before the inmate had served his minimum sentence. Id. at 665. The court stated, "All we held in those cases and all we hold today, therefore, is that, given the particular circumstances of the offenses in these cases, due process was not violated when these prisoners were deemed unsuitable for parole prior to the expiration of their minimum terms." Id. The Ninth Circuit also reiterated Biggs' warning that in some cases, indefinite detention based solely on the commitment offense, regardless of the extent of the prisoner's rehabilitation, will at some point violate due process. Id.

Some district courts have found that continued incarceration based solely on the commitment offense violates due process. In Martin v. Marshall, (Martin I) 431 F. Supp. 2d 1038 (N.D. Cal. 2006), the district court granted the habeas corpus petition of a prisoner whose grant of parole by the Board had been reversed by Governor Gray Davis. The Board had granted parole after the prisoner had completed his minimum sentence and the Governor relied solely on the offense to reverse the grant of parole. The court did not require a new parole hearing because it concluded that the Board had subsequently adopted the Governor's policy of relying on

12

the commitment offense to deny parole. Martin v. Marshall, (Martin II) 448 F. Supp. 2d 1143, 1144 (N.D. Cal. 2006).

Similarly, in Brown v. Kane, 2007 U.S. Dist. LEXIS 35123, at *16-17 (N.D. Cal.) and Thomas v. Brown, 2006 U.S. Dist. LEXIS 94460, at *31-32 (N.D. Cal.), the district court found that the Governor violated due process by relying on the commitment offenses to reverse the Board's grants of parole to prisoners who had completed their minimum sentences.

II. Analysis

As stated in this Court's September 19, 2006 Order Denying Respondent's Motion to Dismiss, Petitioner has a federally protected liberty interest in being released on parole. See Irons, 479 F.3d at 662. Therefore, this Court has subject matter jurisdiction under 28 U.S.C. § 2254 to decide whether the state court unreasonably concluded that the Board's denial of parole was supported by some evidence and thus comported with due process.

Because the state court denial of the habeas petition was a preprinted form with checkmarks and thus completely lacked any reasoned explanation,[6] this Court must independently review the record to decide whether this decision was a reasonable application of clearly established federal law. Himes, 336 F.3d at 853. In denying the state habeas petition, the state court did not identify the "some evidence" standard as the proper standard for reviewing the Board's parole denial and erroneously stated that Petitioner

---

[6] Respondent cites no authority for its contention that the superior court's decision using checkmarks qualifies as a reasoned decision.

13

had filed repeated habeas petitions.  (Pet.'s Ex. F at 327-28.)

Citing Greenholtz v. Inmates of Nebraska Penal & Corr. Complex, 442 U.S. 1, 16 (1979), Respondent argues that because due process only entitles Petitioner to an opportunity to present his case and an explanation of why the Board denied parole, Petitioner received all process due in the parole context under federal law. This argument is unpersuasive.  Greenholtz predates Sass and Biggs, and the Ninth Circuit was aware of Greenholtz when it stated that continued denials of parole based on an unchanging factor may violate due process.

Respondent argues next that the state court decision upholding the denial of parole was a reasonable interpretation of the facts and was supported by some evidence.  As noted above, the Board relied on three factors to deny parole:  the nature of the commitment offense, Petitioner's insufficient participation in self-help programs, and Petitioner's attempted escape.  Although Respondent states that the Board also cited the opposition of the Butte County District Attorney's Office and the victim's next of kin as reasons for the denial, the record shows that the Board merely mentioned this opposition and did not rely on it.  The opposition does not demonstrate Petitioner's unsuitability for parole because it is not probative of the risk of harm Petitioner currently poses to society.

Addressing the nature of the offense, the Board cited its trivial motive and lack of regard for the life and suffering of another.  That the offense showed a lack of regard for the life and suffering of another is not a factor demonstrating unsuitability

14

for parole under California Code of Regulations, title 15 § 2402(c); lack of regard for the life of another is common to all murders.  Rather, section 2402(c) evaluates whether the offense was committed in an "especially" heinous, atrocious, or cruel manner. Two of the factors listed under § 2402(c) do not apply to Petitioner's offense because there was a single victim, and the victim was not defiled.  Three factors under § 2402(c) could show Petitioner committed the offense in an especially heinous, atrocious, or cruel manner:  whether the offense was calculated or dispassionate; whether the offense was carried out in a manner demonstrating an exceptionally callous disregard for human suffering; and whether the motive was trivial.

    Respondent argues that the fact that Petitioner borrowed the murder weapon from a friend, told his friend that he wanted to kill Lewis, and hid his car outside Lewis' home shows that the crime involved planning and calculation.  This interpretation of the facts conflicts with the jury's determination that Petitioner did not lie in wait for Lewis and did not commit first-degree murder, an offense which requires premeditation and deliberation.  The record suggests that Petitioner's decision to confront Lewis only occurred shortly after Petitioner overheard England, and that Petitioner went to Lewis' home to confront him, but did not plan to kill him.  The Board did not characterize the offense as planned or calculated and did not cite this as a reason for denying parole.

    Respondent also argues that the fact that Petitioner sneaked into Lewis' building, forced his way into his door, and shot him demonstrates an "exceptionally" callous disregard for human

15

suffering.  These circumstances do not demonstrate more callousness than is minimally necessary for a second-degree murder conviction. Compared to other second-degree murders, Petitioner's offense was not "exceptionally" callous, and neither the Board nor the state court cited any facts to show otherwise.

Although a trivial motive is a factor tending to support a determination that the offense was committed in an especially heinous, atrocious, or cruel manner, they are not synonymous. Thomas, 2006 U.S. Dist. LEXIS 94460, at *19.  Respondent does not show that jealousy, betrayal, and unrequited love are more trivial than the usual motives for murder.  Petitioner's motive was trivial in relation to the offense, but this alone does not establish that the offense was especially heinous.

Respondent cites Dannenberg, 34 Cal. 4th at 1095 in support of his argument that the Board can deny parole based solely on the commitment offense or other static factors without violating due process.  Respondent also notes that the statement in Biggs 334 F.3d at 917, that parole denial based on an unchanging factor could violate due process, is dicta and therefore does not bind this Court.

Although under Dannenberg the Board may rely on the commitment offense to deny parole by heavily weighing its degree of violence and viciousness, the offense must be "particularly egregious" to justify parole denial.  In this case, the circumstances of the offense were not more aggravated or violent than the minimum necessary to sustain a conviction for second-degree murder. Although he committed the murder by shooting Lewis, Petitioner did

16

not inflict additional violence on him.[7]

Moreover, unlike the inmates in <u>Sass</u>, <u>Irons</u>, and <u>Biggs</u> where the Ninth Circuit upheld the denial of parole, and like the inmates in <u>Martin I</u>, <u>Thomas</u>, and <u>Brown</u> where the district courts reversed the denials of parole, Petitioner had served substantially more than his minimum term at the time of the Board's denial of parole. At some point after an inmate has served his minimum sentence the probative value of his commitment offense as an indicator of "unreasonable risk of danger to society" recedes below the "some evidence" required by due process to support a denial of parole. <u>Brown</u>, 2007 U.S. Dist. LEXIS 35123, at *18-19. The eleven years that Petitioner has served above his minimum term, along with his low security rating, participation in self-help programs, and favorable psychological reports, reduce the predictive value of the commitment offense. He has served more than the aggravated matrix for second-degree murders. Petitioner's commitment offense carries a maximum penalty of life with the possibility of parole. The Board's decisions threaten to increase this sentence to one of life without parole. After twenty-eight years, Petitioner's offense alone does not satisfy the "some evidence" standard. Because Petitioner's commitment offense no longer indicates a risk of danger to society, it is an insufficient basis to deny parole and the superior court unreasonably applied federal law in finding otherwise.

For the same reasons, the Board's reliance on Petitioner's

---

[7] The record is not clear as to whether punches were thrown and who threw them on the night of the offense.

17

attempt to escape without force nineteen years ago does not support denial of parole. Like the commitment offense, the escape attempt is an unchanging factor whose probative value has greatly diminished.

Although the Board also based its denial of parole on a finding that Petitioner had "not sufficiently participated in beneficial self-help programs," it repeatedly commended Petitioner for his completion of numerous self-help programs. The Board noted that Petitioner "has really excelled when it comes to self-help" and that he "has been involved heavily in self-help programs, taking it upon himself to get in programs that are not generally offered." (Pet.'s Ex. A at 58.) No evidence supports the Board's finding that Petitioner has not sufficiently participated in self-help programs.

Further, the other factors under California Code of Regulations, title 15 § 2402(c) tending to show unsuitability for parole do not present "some evidence" to support denial of Petitioner's parole: Petitioner does not have a previous record of violence, unstable relationships, sadistic sexual offenses, mental problems, or serious misconduct in prison. Instead, many of the § 2402(d) factors show that Petitioner is suitable for parole. Petitioner has no other juvenile or adult criminal history, has stable relationships with his family, has demonstrated remorse, is at an age that reduces the probability of recidivism, has marketable skills and realistic plans for release, and has participated in institutional activities, such as working in a variety of jobs and completing many self-help programs, that

18

indicate an enhanced ability to function within the law upon release.  Petitioner's last psychological evaluation stated that he "is an excellent candidate for parole consideration" and has a violence potential "estimated to be no more than the average citizen in the community, and perhaps even lower." (Pet.'s Ex. D at 145.)

By relying on the commitment offense, the escape attempt, and the erroneous statement that Petitioner has not participated in self-help programs to deny parole an eighth time, the Board violated Petitioner's right to due process.  The state court unreasonably applied clearly established federal law to determine that some evidence in the record supported the Board's decision.

## CONCLUSION

For the foregoing reasons, this Court GRANTS the petition for a writ of habeas corpus.  The Board is ordered to hold a new parole hearing within forty-five days of the date of this order.  If no new information is presented at the hearing that establishes that Petitioner poses an unreasonable risk of danger to society, the Board is ordered to find Petitioner suitable for parole and set a release date.

IT IS SO ORDERED.

Dated: 8/1/07

CLAUDIA WILKEN
United States District Judge

19